Filed 5/12/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT HINOJOS,<br><br>    Defendant and Appellant. | B331540<br><br>(Los Angeles County<br>Super. Ct. No. BA476000) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig J. Mitchell, Judge.  Affirmed in part, reversed in part, and remanded.

David R. Greifinger and Marvin E. Vallejo, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews, Amanda V. Lopez and

Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Robert Hinojos appeals from the judgment after his conviction for three counts under the gang conspiracy statute, Penal Code[1] section 182.5, arising from an attack on a prison inmate by individuals associated with the Mexican Mafia. The offenses underlying the three counts were assault by a life prisoner, conspiracy to commit murder, and attempted murder.

On appeal, defendant contends 1) two of his three convictions must be stayed pursuant to section 654; 2) the gang conspiracy statute punishes the same conduct as the gang enhancement, and therefore that enhancement also must be stayed under section 654 as to all counts; 3) because his indictment alleged "Three Strikes" sentencing as to only two of the three counts, doubling the sentence on the third count was improper; 4) the trial court erred in not setting aside the indictment after the Legislature amended the statutes defining gang offenses; 5) the evidence was insufficient to support the convictions; 6) the trial court gave an incorrect instruction on pattern of criminal gang activity; 7) defendant could not be convicted of gang conspiracy to commit assault by a life prisoner because he was not serving a life sentence; 8) the trial court improperly instructed the jury on the natural and probable consequences doctrine in relation to the assault by a life prisoner charge; and 9) the jury improperly convicted him of three

_____

[1] Unspecified statutory citations are to the Penal Code.

2

conspiracies because it was not instructed it could find him guilty of only one.

We agree, and the Attorney General concedes, that two of defendant's three convictions must be stayed under section 654. We reject the rest of his challenges. The gang enhancement punishes aspects of criminal conduct beyond those in the gang conspiracy statute, and therefore section 654 does not bar imposition of that enhancement. Case law, including a decision from this division, holds that allegations of Three Strikes sentencing as to some counts is sufficient to allege that sentencing as to all eligible counts. There was substantial evidence to support the convictions, and therefore any error in not setting aside the indictment was harmless. The trial court properly instructed the jury on pattern of criminal gang activity. Although defendant was not a life prisoner at the time of the charged offenses, a person may be convicted of conspiracy to commit a crime even if he could not commit the underlying crime itself—the exception to that rule cited by defendant does not apply, and we decline to follow case law holding otherwise. The trial court did not err in instructing on the natural and probable consequences doctrine. The jury did not convict defendant of three conspiracies, but a single conspiracy charged three ways, and defendant fails to show this was improper.

Accordingly, we affirm the convictions and remand for the trial court to stay execution of sentence on two of the three counts.

## FACTUAL BACKGROUND

The prosecution offered the following evidence at defendant's trial. We limit our summary to the information relevant to resolution of this appeal.

The Mexican Mafia is a prison "gang of gangs" to which other gangs and drug dealers must pay money or face violent retribution.  The Mexican Mafia has an organized hierarchy, with members running particular prisons or prison systems, and underlings running particular floors or modules of the prison.  Members also have "secretaries," a "highly coveted role" within the Mexican Mafia.  The secretary speaks on behalf of the member he represents and can facilitate extortion, drug dealing, and other crimes.

The jury heard several recordings of wiretapped telephone calls between individuals affiliated with the Mexican Mafia.  The jury also heard from Rene Enriquez, a former member of the Mexican Mafia called by the prosecution as a gang expert.  Enriquez offered his interpretation of statements made in those wiretapped conversations and identified some of the individuals involved.

The first call was between Ricky Fao and Francisco Espinoza, also known as Cisco.  Fao was the secretary for Mexican Mafia member Emiliano Lopez, also known as Tonito.  In that call, Fao and Cisco discussed the status of Mexican Mafia member Eduardo Castro, also known as Eddie Boy, specifically whether Eddie Boy was being stripped of his authority within the gang.

In another call, as interpreted by Enriquez, Fao indicated that if Eddie Boy were no longer a member of the gang, Fao would kill Sergio Sanchez, also known as Listo, who claimed to represent Eddie Boy.

In a call on August 1, 2015 between Fao and Jerome Moreno, also known as Gauge, Gauge identified defendant, whom

he called Dopey, as the secretary for Peanut Butter, a moniker for Mexican Mafia member Robert Ruiz.

Later that same day, Fao, Cisco, and defendant spoke on the phone. Defendant at that time was incarcerated at Centinela State Prison, the same prison at which Listo was incarcerated. Defendant described a confrontation he had with Listo in which defendant had told Listo to handle matters respectfully, but Listo instead "chose to do it offensively." Defendant said Listo was "threatening people and trying to get loud" with Mexican Mafia representatives. Defendant stated Listo was a threat to Mexican Mafia associates in the prison yard, and defendant had put those associates in touch with Peanut Butter. According to defendant, Peanut Butter said, " 'Yeah, if you perceive that as a threat, do what you guys gotta do.' " Peanut Butter further said, " 'I approve it.' " Gang expert Enriquez interpreted this as Peanut Butter giving approval to kill the intended target.

Defendant further relayed to Fao and Cisco that Listo had told him he was working for Mexican Mafia member Little Man, an associate of Eddie Boy. Defendant stated Listo was "trying to utilize [Little Man's] name on this yard, to not have to pay the third" of his criminal proceeds to the Mexican Mafia. Gang expert Enriquez stated someone who lies about working for a Mexican Mafia member to avoid paying a tax to the gang "get[s] whacked."

Gauge then joined the phone conversation and said he had let someone called Kid know and "he's on board with it." Defendant said, "[H]im and Drifter ain't got no choice." He said, "It's approved by me and Omar and Pops for them two to do it." Gauge said, "I told them to serve him good," and defendant said, "Yeah, for running his god damn mouth, homes." Gang expert

Enriquez interpreted this as the group having selected the people to "do the hit" on Listo, and defendant stating he approved it as did two others, including "Pops," another name for Peanut Butter. Enriquez said it was of "paramount importance" to have permission from the Mexican Mafia before killing someone.

Fao said, "Take his fucking head off," and defendant chuckled. Gauge said someone, apparently referring to Listo, was selling drugs without permission, and defendant said, "See? That's . . . a good enough reason."

Two days later, on August 3, 2015, two inmates, identified as Victor Garcia and Randy Ortiz, chased Listo in the prison yard and stabbed him repeatedly. Both Garcia and Ortiz were serving life sentences at the time.

On August 5, 2015, Gauge and Fao spoke on the phone, and Gauge said Listo had been "hit." Gauge explained the attack was delayed because Listo had gone to court, and did not return before the individuals selected to attack him had to leave the yard for the day. Gauge arranged for two other prisoners to perform the hit instead.

## PROCEDURAL BACKGROUND

A grand jury issued an indictment charging defendant with three counts under section 182.5, commonly called the gang conspiracy statute.[2] (See *People v. Lopez* (2022) 82 Cal.App.5th 1, 6.) The three substantive offenses underlying the gang conspiracy counts were assault by a life prisoner, conspiracy to

_____

[2] The indictment and, later, the verdict forms in this case did not characterize the charges under section 182.5 as gang conspiracy, but "participation in a criminal street gang." We choose to use the term "gang conspiracy."

6

commit murder, and attempted murder. The indictment alleged a gang enhancement on each count under section 186.22, subdivision (b)(1)(C). On counts 1 and 2, the information alleged defendant had suffered a prior conviction subjecting him to sentencing under the Three Strikes law (§§ 667, subds. (b)–(j), 1170.12) and an enhancement under section 667, subdivision (a)(1).

On May 25, 2023, following trial, a jury found defendant guilty of all three counts. In a bifurcated proceeding, the jury found the gang enhancement allegations true as to all counts, and also found true that defendant had suffered a prior conviction.

At sentencing, the trial court selected count two, gang conspiracy with the underlying substantive offense of conspiracy to commit murder, as the primary count, and imposed sentence of 50 years to life plus 10 years for the gang enhancement. On count one, with the underlying offense of assault by a life prisoner, the court imposed 18 years to life plus 10 years for the gang enhancement. On count three, with the underlying offense of attempted murder, the court imposed 14 years to life plus 10 years for the gang enhancement.[3] The terms imposed for each count reflect a doubling of the base sentence pursuant to the

---

[3] In rendering judgment, the trial court did not state whether the sentences on the three counts were consecutive or concurrent. The minute order from the sentencing, however, states the sentences are consecutive, as does the abstract of judgment, making defendant's total sentence 112 years to life. Because we conclude *post* the court must stay the sentences on two of the three counts pursuant to section 654, we need not address the concurrent/consecutive issue further.

Three Strikes law. The court awarded credits and imposed fines and fees.

Defendant timely appealed.

## DISCUSSION

### A. Sentence on Two of the Three Counts Must Be Stayed Under Section 654

Section 654 states, in relevant part, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) "Section 654 'generally precludes multiple punishments for a single physical act that violates different provisions of law [citation] as well as multiple punishments for an indivisible course of conduct that violates more than one criminal statute.' [Citations.]" (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 94, italics omitted.)

Defendant argues two of his three sentences must be stayed under section 654. The Attorney General agrees, as do we. The three charges of which defendant was convicted all arose from the same course of conduct, namely defendant's participation in the attack on Listo. Although that conduct violated multiple provisions of law, section 654 bars the multiple punishments imposed by the trial court.

### B. Section 654 Does Not Bar Imposition of the Gang Enhancement on Defendant's Gang Conspiracy Convictions

Defendant argues section 654 also bars imposition of the gang enhancement under section 186.22, subdivision (b)(1) on his

8

convictions under section 182.5, because both provisions "punish active gang participants who knowingly promote or commit crimes on behalf of gangs." We disagree.

Section 654 applies to enhancements as well as substantive offenses. (*People v. Ahmed* (2011) 53 Cal.4th 156, 163 (*Ahmed*).) "But enhancements are different from substantive crimes, a difference that affects *how* section 654 applies to enhancements. Provisions describing substantive crimes . . . generally define criminal *acts*. But enhancement provisions do not define criminal acts; rather, they increase the punishment for those acts. They focus on *aspects* of the criminal act that are not always present and that warrant additional punishment." (*Ahmed*, at p. 163.) "[S]ection 654 bars multiple punishment for the same *aspect* of a criminal act." (*Ahmed*, at p. 164.)

The question before us is whether the gang enhancement punishes the same underlying conduct as the gang conspiracy statute or, as articulated in *Ahmed*, the enhancement instead punishes an "aspect" of gang conspiracy that is "not always present." (*Ahmed*, *supra*, 53 Cal.4th at p. 163.) In other words, if a conviction under section 182.5 necessarily also satisfies the elements of section 186.22, subdivision (b)(1), section 654 would prohibit applying the enhancement to the conviction.

Section 182.5, the gang conspiracy statute, provides, in relevant part, "[A]ny person who actively participates in any criminal street gang, as defined in subdivision (f) of Section 186.22, with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, as defined in subdivision (e) of Section 186.22, and who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang is guilty of conspiracy to commit that

9

felony and may be punished as specified in subdivision (a) of Section 182." Section 182 is the general conspiracy statute.

Section 186.22, subdivision (b)(1), the gang enhancement, provides, in relevant part, "[A] person who is convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the person has been convicted, be punished" with additional time as set forth in subparagraphs (A) through (C) of that subdivision.

Although defendant is correct there is overlapping language in the two provisions, they differ in at least two key respects. First, the gang enhancement punishes defendants who commit felonies "with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).) The gang conspiracy statute goes further, penalizing not only a defendant who "promotes, furthers, [or] assists" felonies committed by gang members, but also a defendant who "benefits" from those felonies (§ 182.5), "even if he or she did not promote, further, or assist in the commission of that particular substantive offense." (*People v. Johnson* (2013) 57 Cal.4th 250, 262.) "When such benefits are proven along with the other elements of the statute, section 182.5 permits those benefitting gang participants to be convicted of conspiracy to commit the specific offense from which they benefitted." (*Johnson*, at p. 262.)

Thus, it is possible for a defendant to be convicted under section 182.5 merely for benefitting from felonies committed by

gang members, without any further involvement in the crimes. Because that defendant did not intend to promote, further, or assist those specific crimes, the defendant would not be eligible for the gang enhancement, which requires that specific intent. That specific intent, therefore, is an "aspect" of the crime "not always present" in a violation of section 182.5. (*Ahmed*, *supra*, 53 Cal.4th at p. 163.)

Another key difference between the gang conspiracy statute and the gang enhancement statute is that the latter, unlike the former, applies only to felonies "committed for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subd. (b)(1).) As our Supreme Court observed, the Legislature included this limitation to the gang enhancement "to make it 'clear that a criminal offense is subject to increased punishment . . . only if the crime is "gang related." ' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)

It is true that section 182.5 applies only to crimes committed by gang members, but as our Supreme Court has recognized, " '[n]ot every crime committed by gang members is related to a gang.' " (*People v. Cooper* (2023) 14 Cal.5th 735, 743, quoting *Albillar*, *supra*, 51 Cal.4th at p. 60.) For example, crimes " 'may . . . be committed by gang members only for personal gain.' " (*Cooper*, at p. 743.) Crimes committed by gang members only for personal gain logically would not be "for the benefit of" or "at the direction of . . . a criminal street gang." (§ 186.22, subd. (b)(1).)

Our Supreme Court has also indicated the fact that gang members commit a crime together does not, in all cases, establish the crime was committed "in association with a criminal street gang." (§ 186.22, subd. (b)(1).) " '[I]t is conceivable that several

11

gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang.' [Citation.]" (*Albillar*, *supra*, 51 Cal.4th at p. 62.) Accordingly, in *Albillar*, the high court did not conclude the crime at issue in that case, a rape, was committed "in association with a criminal street gang" simply because it was committed by three gang members acting in concert. Rather, the court discussed and analyzed expert opinion offered in that case, and concluded "[t]he record supported a finding that defendants relied on their common gang membership and the apparatus of the gang in committing the sex offenses." (*Id.* at p. 60.)[4]

That crimes committed by gang members acting in concert are not necessarily crimes committed "in association with a criminal street gang" is further supported by *Albillar*'s analysis of section 186.22, subdivision (a). That subdivision, commonly called the "substantive gang offense" (*Albillar*, *supra*, 51 Cal.4th at p. 54), punishes "[a] person who actively participates in a criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in felonious criminal conduct by members of that gang." (§ 186.22,

---

[4] Justice Werdegar, joined by Justice Moreno, wrote a separate opinion disagreeing with the majority that the evidence supported a finding that the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang. (*Albillar*, *supra*, 51 Cal.4th at p. 68.) Justices Werdegar and Moreno agreed, however, with the majority's analysis of section 186.22, subdivision (a), which we discuss *post*. (*Albillar*, at p. 68.)

subd. (a).)<sup>5</sup> Through this subdivision, " 'the Legislature sought to punish gang members who acted *in concert* with other gang members." (*People v. Renteria* (2022) 13 Cal.5th 951, 962 (*Renteria*).)  Thus, "section 186.22(a) does not reach the conduct of a gang member acting alone." (*Renteria*, at p. 962.)

In *Albillar*, our Supreme Court held a defendant violates section 186.22, subdivision (a) when the defendant "willfully promotes, furthers, or assists in *any* felonious criminal conduct by gang members," with no requirement "the felonious criminal conduct be gang related." (*Albillar*, 51 Cal.4th at p. 54.)  The court reasoned the Legislature, had it wished to limit the substantive gang offense to gang-related crimes, could have included the language present in section 186.22, subdivision (b)(1) limiting the gang enhancement to crimes "committed *for the benefit of, at the direction of, or in association with any criminal street gang*." (*Albillar*, at p. 56.)

If crimes committed by gang members in concert necessarily were crimes committed "in association with a criminal street gang," then *every* crime committed by gang members in concert would be "gang related," because crimes committed "in association with [a] criminal street gang" are, by definition, gang-related crimes.  (See *Albillar*, *supra*, 51 Cal.4th at p. 60 [gang enhancement's requirement that crime be for benefit of, at direction of, or in association with criminal street gang indicates Legislature's intent to limit enhancement to gang-related crimes].)  This is not what our Supreme Court concluded

---

<sup>5</sup> We quote here the current version of section 186.22, subdivision (a).  The version at issue in *Albillar* differed slightly (see *Albillar*, *supra*, 51 Cal.4th at p. 54), but those differences are not material to our analysis.

13

in *Albillar*. Rather, our Supreme Court held crimes under section 186.22, subdivision (a) are *not* necessarily gang-related, as indicated by the absence of language limiting that offense to crimes committed, inter alia, "in association with a criminal street gang." (§ 186.22, subd. (b)(1).) In so reasoning, our Supreme Court drew a distinction between gang members acting in concert, as required by section 186.22, subdivision (a), and gang members acting "in association with a criminal street gang" under section 186.22, subdivision (b)(1).

The language of section 182.5, the gang conspiracy statute, closely tracks the language of section 186.22, subdivision (a), the substantive gang offense. Both require the defendant's involvement in "felonious criminal conduct by" gang members. (§§ 182.5 [applying to "any person . . . who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang"]; 186.22, subd. (a) [applying to "[a] person . . . who willfully promotes, furthers, or assists in felonious criminal conduct by members of that gang"].) *Albillar*'s analysis of section 186.22, subdivision (a) applies equally to section 182.5, and makes clear that promoting, furthering, assisting, or benefitting from crimes by gang members does not in itself establish those crimes were committed "in association with a criminal street gang" under section 186.22, subdivision (b)(1).

We recognize that, "where multiple gang members were involved in the charged offense, the fact of their joint involvement in a crime often provides sufficient evidence of association and benefit" for purposes of the gang enhancement. (*Renteria, supra,* 13 Cal.5th at p. 963; see *People v. Garcia* (2016) 244 Cal.App.4th 1349, 1367 ["Committing a crime in concert with known gang

members can be substantial evidence that the crime was committed in 'association' with a gang."].)  As a practical matter, therefore, it may be the rare case in which a violation of section 182.5 based on the defendant's willfully promoting, furthering, or assisting crimes by other gang members does not also satisfy the elements of the gang enhancement under section 182.66, subdivision (b)(1).  Our high court in *Albillar*, however, expressly contemplated the possibility of that rare case, the so-called " 'frolic and detour unrelated to the gang.'  [Citation.]" (*Albillar*, *supra*, 51 Cal.4th at p. 62.)  We therefore cannot conclude that section 182.5 necessarily encompasses the elements of section 182.66, subdivision (b)(1).

In sum, the enhancement under section 186.22, subdivision (b)(1) punishes "aspects" of a violation of section 182.5 that are "not always present" (*Ahmed*, *supra*, 53 Cal.4th at p. 163), namely 1) that the defendant intends to promote, further, or assist the criminal conduct rather than simply benefit from it; and 2) that the violation is gang-related, as opposed to committed by gang members for their own purposes unrelated to the gang.  Section 654 therefore does not prohibit imposing the gang enhancement on a conviction under section 182.5 upon proof of the additional elements required under section 186.22, subdivision (b)(1).

## C.    The Trial Court Did Not Err In Applying Three Strikes Sentencing to All Counts

The indictment in the instant case alleged a prior felony conviction subjecting defendant to Three Strikes sentencing on counts 1 and 2, but did not so allege as to count 3.  The trial court nonetheless imposed Three Strikes sentencing on all three counts.  Defendant argues this was error because the indictment

did not provide fair notice that he would receive a Three Strikes sentence on count 3.[6]

We rejected this same argument in *People v. Laanui* (2021) 59 Cal.App.5th 803 (*Laanui*), in which an information alleged Three Strikes sentencing as to only three of four eligible counts. (*Id.* at p. 814.) As we explained, "a defendant's prior conviction status is not based on the circumstances of his current offense, and thus 'does not change from one count to another.' [Citation.]" (*Id.* at p. 817.) "Further, . . . the plain language of the Three Strikes law makes clear that the prosecution lacks discretion to allege prior strikes on some counts but not others." (*Id.* at p. 818, citing §§ 667, subd. (f)(1), 1170.12, subd. (d)(1), and *People v. Roman* (2001) 92 Cal.App.4th 141, 145.) "Thus, although the prosecution drafted the information in the instant case inartfully, and purported to allege the prior strike only as to some eligible counts, it would be evident to defendant on the face of the Three Strikes law that the prior strike would apply to all eligible counts, unless the trial court dismissed the strike either on its own motion or in response to a motion by the prosecution or defense. [Citations.] In short, an information invoking the Three Strikes law and alleging a prior strike, in tandem with the language of the Three Strikes law itself, provides adequate notice that the prosecution is charging defendant as a recidivist offender subject to the Three Strikes sentencing regime on all eligible offenses." (*Laanui*, at p. 818.)

Our colleagues in Division Five reached the same conclusion in *People v. Morales* (2003) 106 Cal.App.4th 445, a

---

[6] Because we conclude defendant's challenge fails on the merits, we do not address the Attorney General's argument that defendant forfeited this challenge.

case on which *Laanui* relied.  (See *Laanui*, *supra*, 59 Cal.App.5th at p. 816.)  *Morales* held it was error for the trial court not to impose Three Strikes sentences on all eligible counts when the information pleaded Three Strikes sentencing as to only some eligible counts.  (*Morales*, at p. 456.)  *Morales* noted that "[p]rior conviction findings fall in the category of [enhancements] that describe the offender rather than the offense," and therefore "[i]n order for enhanced recidivist sentencing to occur, all that is necessary is that the defendant previously had been convicted of a . . . violent felony such as occurred in this case."  (*Id.* at p. 455.)  *Morales* further noted the Three Strikes law requires its sentencing provisions to be " 'applied in every case in which a defendant has a prior felony conviction . . . .' "  (*Ibid.*)  "Fairly construed, sections 667 and 1170.12 require enhanced sentencing once a prior violent felony conviction has been pled and found to be true, unless the court dismisses the prior conviction finding pursuant to section 1385, subdivision (a)."  (*Morales*, at p. 456.)

Defendant does not cite or discuss *Laanui* or *Morales*, and provides no basis to deviate from that precedent.  He cites *People v. Sawyers* (2017) 15 Cal.App.5th 713, which held an information that alleged a prior conviction but did not refer to the Three Strikes law provided inadequate notice of Three Strikes sentencing.  (*Id.* at p. 718.)  That holding is inapplicable where, as in the instant case, the accusatory pleading expressly cited the Three Strikes law.  (See *Laanui*, *supra*, 59 Cal.App.5th 803, 818, fn. 15 [distinguishing *Sawyers*].)

Defendant also cites *People v. Robinson* (2004) 122 Cal.App.4th 275, which stated, "Due process requires the pleading apprise the defendant of the potential for an enhanced penalty and allege every fact and circumstance necessary to

17

establish the increased penalty." (*Id.* at p. 282.) *Robinson* did not concern Three Strikes sentencing—rather, it addressed whether the trial court erred in allowing the prosecution to amend an information to add a charge of petty theft with a prior theft-related offense, when no evidence had been presented at the preliminary hearing of the prior offense. (*Id.* at p. 281.) The court concluded prior convictions "establish[ing] an alternate and elevated penalty for a petty theft conviction" "need not be adduced at the preliminary hearing" nor "specifically pleaded in the information or indictment." (*Id.* at pp. 281–282.) The court further concluded the information, which charged the defendant with two counts of robbery and alleged prior theft convictions, provided adequate notice "of the potential for increased penalty and each fact and circumstance necessary to establish that increased penalty." (*Id.* at p. 282.)

*Robinson* if anything supports our holding here. *Robinson* in essence held the information at issue implicitly alleged a charge of petty theft with a prior, and therefore the trial court properly could amend the complaint to expressly add that charge without violating due process. *Laanui* similarly held that that invocation of the Three Strikes law and allegation of a prior strike as to some counts implicitly extended Three Strikes sentencing to all eligible counts.

In sum, the trial court properly imposed Three Strikes sentences on all counts.

## D. Defendant Fails To Show Prejudice From the Denial of His Motion To Set Aside the Indictment

The grand jury issued the indictment against defendant on September 19, 2019. Effective January 1, 2022, the Legislature amended several subsections of section 186.22, which increased

18

the evidentiary requirements to prove gang offenses and enhancements. (Assem. Bill No. 333 (2021–2022 Reg. Sess.) Stats. 2021, ch. 699; see *People v. Tran* (2022) 13 Cal.5th 1169, 1206.) Defendant then moved under section 995 to set aside his indictment, contending the evidence submitted to the grand jury in support of the gang allegations did not satisfy the new requirements. The trial court denied defendant's motion, concluding the evidence was sufficient under the law as it existed at the time of the indictment. On appeal, defendant argues this was error.[7]

Assuming arguendo the trial court erred, "even an erroneous denial of a section 995 motion justifies reversal of a judgment of conviction only when a defendant is able to demonstrate prejudice at trial flowing from the purportedly inadequate evidentiary showing at the preliminary hearing." (*People v. Crittenden* (1994) 9 Cal.4th 83, 136–137.) "Where the evidence produced at trial amply supports the jury's finding, any question whether the evidence produced at the preliminary hearing supported the finding of probable cause is rendered moot." (*Id.* at p. 137; accord, *People v. Lightsey* (2012) 54 Cal.4th 668, 730.)

Defendant does not explain how the denial of his section 995 petition prejudiced him. As we discuss *post*, his challenges to the sufficiency of evidence at trial, which we assess under the current gang statutes as amended by Assembly Bill No. 333, are without merit. Defendant therefore fails to show the denial of his section 995 motion constituted reversible error.

---

[7] Defendant previously challenged the denial of his section 995 motion through petitions for writs of mandate in this court and the Supreme Court, which were summarily denied.

19

*Chavez v. Superior Court* (2024) 99 Cal.App.5th 165 does not help defendant. That case held that a trial court has the inherent authority to postpone deciding a motion to dismiss an indictment to allow the prosecution to reopen grand jury proceedings and submit new evidence addressing the amended gang requirements under Assembly Bill No. 333. (*Chavez*, at p. 177.) Because the trial court in *Chavez* reopened the grand jury proceedings, the appellate court in that case had no occasion to address the question of prejudice stemming from the denial of a section 995 motion and is not instructive on that issue.

## E. The Convictions Were Supported By Substantial Evidence

Defendant argues there was insufficient evidence that he aided and abetted or benefitted from the offenses underlying his convictions under section 182.5. He further argues the evidence was insufficient to establish a pattern of criminal gang activity, a necessary element to prove the existence of a criminal street gang. (See § 186.22, subd. (f).)

When reviewing a challenge to the sufficiency of the evidence, we " ' "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citation.]" (*People v. Ghobrial* (2018) 5 Cal.5th 250, 277, italics omitted.) We "draw[ ] all reasonable inferences in favor of the jury's findings." (*People v. Perez* (2017) 18 Cal.App.5th 598, 607.)

20

### 1. *There was substantial evidence that defendant promoted, furthered, and assisted felonious conduct by gang members*

For culpability under section 182.5, a defendant must, inter alia, "willfully promote[ ], further[ ], assist[ ], or benefit[ ] from . . . felonious criminal conduct" committed by members of a gang in which the defendant "actively participates."

Defendant argues, "The evidence against [defendant] on counts 1–3 was that he was part of a phone discussion in which various individuals discussed assaulting Listo for some disrespect he committed against one or more individuals alleged to be Mexican Mafia members or associates. In the phone discussion, [defendant] appears to *acquiesce* that Listo should be assaulted and he also appears to approve of the assault on Listo. However, that was the extent of the evidence. Nothing indicated that [defendant] was an active gang member who was knowingly aiding or abetting, or benefitting from, the assault on Listo."

We disagree with defendant's characterization of the evidence. There was evidence defendant "actively participate[d]" in the Mexican Mafia, namely wiretapped phone calls indicating he served as a secretary for a Mexican Mafia member and acted on behalf of that member. Defendant also expressly approved the attack on Listo, both on his own behalf and on the behalf of the member for whom he served as secretary. According to the prosecution's gang expert, obtaining permission before a killing was of "paramount importance" in the Mexican Mafia. It is reasonable to infer, therefore, that defendant's approval of the attack was not mere acquiescence, but a necessary step before the attack could occur. That approval "further[ed]" and "assist[ed]" the attack. (§ 182.5.)

21

Defendant argues it would cause "serious [F]irst [A]mendment and freedom of speech considerations" if acquiescence to criminal activity were deemed to violate section 182.5. As we have explained, defendant's conduct consisted of more than acquiescence. The First Amendment to the federal Constitution does not protect speech in the service of conspiracy, or "which is directed to inciting or producing imminent lawless action." (*McCollum v. CBS, Inc.* (1988) 202 Cal.App.3d 989, 1000.)

## 2. *There was substantial evidence of a pattern of criminal activity*

Section 182.5 requires proof that the defendant "actively participates in any criminal street gang, as defined in subdivision (f) of Section 186.22." Section 186.22, subdivision (f) defines " 'criminal street gang' " as "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." Proving a "pattern of criminal gang activity" requires, inter alia, proof of "two or more" enumerated offenses "committed on separate occasions or by two or more [gang] members." (§ 186.22, subd. (e)(1).) Those offenses, moreover, must have "commonly benefited a criminal street gang, and the common benefit from the offenses is more than reputational." (*Ibid.*) The offenses used to prove a pattern of criminal gang activity are commonly referred to as "predicate offenses." (See *People v. Lamb* (2024) 16 Cal.5th 400, 444.)

22

At defendant's trial, the prosecution offered evidence of three predicate offenses. The first involved defendants Nancy Alonzo, Hector Duarte, Gail Ponce, and David Bernardino. A sheriff's deputy assigned to the major crimes prison gang unit testified that Duarte ran a jail for the Mexican Mafia, with his sister, Alonzo, facilitating. Ponce was secretary for Bernardino, who ran a housing area within the jail under Duarte. All pleaded no contest and admitted to gang enhancement allegations in a case arising from extortion and assault. The deputy opined the crimes benefitted the Mexican Mafia by keeping control over inmates within the jails by extorting money from them and assaulting them if they did not pay.

The second predicate offense involved defendants Roberto Lopez, Constanza Olivas, Miguel Rodriguez, Jason Jones, and Juan Garcia. The deputy testified Rodriguez worked for the Mexican Mafia member in control of the entire jail facility and conspired with the others to smuggle drugs into the jail. The deputy explained the plan was for Rodriguez to sell the drugs within the jail and provide a significant amount of the proceeds to the Mexican Mafia member for whom he worked. All defendants pleaded no contest to conspiracy and admitted the gang enhancement allegations.

The third predicate offense involved Fao, the individual who also participated in the wiretapped phone calls concerning the attack on Listo, and who served as secretary to a Mexican Mafia member. An agent with the California Department of Justice Bureau of Investigation testified Fao approved an attack on a suspected informant, and pleaded no contest to gang conspiracy to commit attempted murder. The agent opined the

attack benefitted the Mexican Mafia by eliminating someone interfering in gang affairs.

Defendant argues, "[N]one of the predicate defendants was identified as being gang members" and "no evidence was presented as to how the predicate offenses benefitted the Mexican Mafia." We reject this argument. Duarte, a defendant in the first predicate offense, was identified as running a jail for the Mexican Mafia, with Bernardino acting under him. Rodriguez, a defendant in the second predicate offense, was identified as working for the Mexican Mafia member in charge of the jail. Fao, the defendant in the third predicate offense, was identified as a secretary for a Mexican Mafia member. This was sufficient to establish these defendants were members of the Mexican Mafia for purposes of section 186.22. The deputy and the agent further offered their expert testimony as to how each predicate offense benefitted the Mexican Mafia. We conclude the prosecution set forth substantial evidence that the Mexican Mafia engaged in a pattern of criminal activity.

## F.     The Trial Court Did Not Err In Instructing the Jury on Pattern of Criminal Gang Activity

The trial court instructed the jury that "[t]he People need not prove that every perpetrator involved in the pattern of criminal gang activity, if any, was a member of the alleged criminal street gang at the time when such activity was taking place." The court further instructed, "If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was the commission of that crime."

Defendant contends these instructions were erroneous. He quotes our decision in *People v. Sek* (2022) 74 Cal.App.5th 657

24

(*Sek*), in which we stated, "Under the newly amended law, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses. (§ 186.22, subd. (e)(2).) In addition, both predicate offenses must have been committed 'within three years of the date the current offense is alleged to have been committed,' by gang 'members,' and must have been for the 'common[ ] benefit[ ] [of] a criminal street gang.' (§ 186.22, subd. (e)(1).)" (*Sek*, at p. 665.)

Defendant is correct that, as *Sek* stated, a defendant's current charged offense cannot be used as a predicate offense for purposes of proving a pattern of criminal gang activity. (§ 186.22, subd. (e)(2); *Sek*, *supra*, 74 Cal.App.5th at p. 665.) The trial court did not instruct, however, that the jury could use defendant's charged offenses to prove a pattern of criminal gang activity— rather, the instruction stated defendant's charged offenses could be used to prove "one of the group's primary activities was the commission of that crime."

"[P]rimary activities" is a separate element from "pattern of criminal gang activity" under section 186.22, subdivision (f). (See *id.* [a criminal street gang "ha[s] as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), . . . *and* . . . members collectively engage in, or have engaged in, a pattern of criminal gang activity"], italics added.) Our Supreme Court implicitly acknowledged this in *People v. Clark* (2024) 15 Cal.5th 743 (*Clark*), which stated that to prove the existence of a criminal street gang, the prosecution must, inter alia, show "a connection between the *predicate offenses* and the organizational structure, *primary activities*, or common goals and principles of the gang." (*Id.* at p. 749, italics added.)

25

Nothing in section 186.22, even as amended by Assembly Bill No. 333, prohibits the use of a defendant's current offense to prove "primary activities" as opposed to a "pattern of criminal gang activity." Defendant cites no authority to the contrary.

It is not clear what defendant's objection is to the instruction stating that every participant in a predicate offense need not be a gang member. He reiterates his argument that there was no evidence any of the defendants involved in the predicate offenses was a gang member, an argument we have rejected. To the extent he means to argue every defendant involved in a predicate offense, or at least more than one, must be a gang member, our Supreme Court rejected this argument in *Clark*. In *Clark*, the court noted a pattern of criminal gang activity requires proof of two or more offenses "committed 'on separate occasions *or* by two or more [gang] members.' " (*Supra*, 15 Cal.5th at p. 754, quoting § 186.22, subd. (e)(1).) "By contrasting offenses committed on 'separate occasions' with those committed by 'two or more members,' the language of section 186.22(e)(1) indicates that only the second alternative requires the participation of more than one gang member." (*Clark*, at p. 754.)

In the instant case, the prosecution offered evidence of three predicate offenses, committed on three separate occasions, all involving at least one gang member. The trial court thus correctly instructed the jury that, under these circumstances, the prosecution did not have to prove that every participant in the predicate offenses was a gang member.

## G. Defendant Can Be Convicted of Gang Conspiracy To Commit Assault By a Life Prisoner

Defendant was convicted under the gang conspiracy statute of assault by a life prisoner under section 4500.[8] Defendant argues this was improper, because he himself was not a life prisoner at the time of the offense. In support, defendant cites *People v. Roberts* (1983) 139 Cal.App.3d 290 (*Roberts*), which held that a nonlife prisoner may not be convicted of conspiracy to commit assault by a life prisoner. (*Id.* at pp. 293–294.) The Attorney General argues *Roberts* was wrongly decided. We agree with the Attorney General. We assume arguendo that conspiracy under section 182 and gang conspiracy under section 182.5 are materially equivalent for purposes of our discussion.

As a general matter, a defendant may be convicted of conspiracy to commit an offense even if the defendant could not commit the offense itself. (See *People v. Lee* (2006) 136 Cal.App.4th 522, 529 (*Lee*).) For example, an inmate may be convicted for conspiring to violate a prohibition on noninmates providing illegal drugs to inmates, even though the prohibition itself does not apply to the inmate. (*Id.* at p. 528.)

---

[8] Section 4500 provides, in relevant part, "Every person while undergoing a life sentence, who is sentenced to state prison within this state, and who, with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury is punishable with death or life imprisonment without possibility of parole. . . . [H]owever, in cases in which the person subjected to such assault does not die within a year and a day after such assault as a proximate result thereof, the punishment shall be imprisonment in the state prison for life without the possibility of parole for nine years."

27

This rule stems from the fact that " '[c]ollaboration [among conspirators] magnifies the risk to society both by increasing the likelihood that a given quantum of harm will be successfully produced and by increasing the amount of harm that can be inflicted.' " (*Lee, supra*, 136 Cal.App.4th at p. 529.) " ' "Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish. Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed." ' " (*Ibid.*) " 'Thus wrongful conduct by such combination should be criminally punished even when the same acts would be excused or receive a lesser punishment when performed by an individual . . . .' [Citation.]" (*Ibid.*)

In *Roberts*, a life prisoner and nonlife prisoner were jointly charged with conspiracy to commit assault by a life prisoner. (*Roberts, supra*, 139 Cal.App.3d at p. 291.) *Roberts* recognized the general rule that a person may be convicted of conspiring to commit a crime he himself could not commit. (*Id.* at p. 293.) *Roberts* held the rule did not apply in that case, however, because the Legislature had enacted two statutes, one governing assaults by life prisoners (§ 4500), and one governing assaults by nonlife prisoners (§ 4501).[9] *Roberts* stated, "Section 4501 of the Penal

---

[9] In addition to assaults by nonlife prisoners, section 4501 applies to assaults by life prisoners without malice aforethought.

Code deals with a person in respondent's classification, i.e., a state prisoner serving less than a life sentence, but dealing with the same type of prohibited conduct specified in section 4500 of the Penal Code." (*Roberts*, *supra*, 139 Cal.App.3d at p. 293.) *Roberts* concluded the Legislature, in enacting both sections 4500 and 4501, "acted in such a fashion there appears to be an affirmative legislative interest to impose a lesser punishment on [nonlife prisoners].  To make use of the conspiracy charge to defeat this legislative intent is not permissible." (*Id.* at pp. 293–294.)  " 'The foregoing rule is necessary to prevent a general statute from swallowing up the exceptions contained in specific enactments.' " (*Id.* at p. 294.)  Accordingly, *Roberts* affirmed the trial court's dismissal of the conspiracy count against the nonlife prisoner.  (*Id.* at pp. 292, 294.)

In reaching this conclusion, *Roberts* relied on a Supreme Court case, *People v. Buffum* (1953) 40 Cal.2d 709 (*Buffum*), overruled on other grounds by *People v. Morante* (1999)

---

(See *People v. Nava* (2024) 107 Cal.App.5th 624, 631–632 [life prisoner who commits assault meeting all elements of § 4500 except malice aforethought can be convicted under § 4501].) It states, "(a) Except as provided in Section 4500, every person confined in the state prison of this state who commits an assault upon the person of another with a deadly weapon or instrument shall be guilty of a felony and shall be imprisoned in the state prison for two, four, or six years to be served consecutively.  [¶] (b) Except as provided in Section 4500, every person confined in the state prison of this state who commits an assault upon the person of another by any means of force likely to produce great bodily injury shall be guilty of a felony and shall be imprisoned in the state prison for two, four, or six years to be served consecutively."

29

20 Cal.4th 403, and two Court of Appeal cases, *Williams v. Superior Court* (1973) 30 Cal.App.3d 8 (*Williams*), and *People v. Mayers* (1980) 110 Cal.App.3d 809 (*Mayers*). (See *Roberts*, *supra*, 139 Cal.App.3d at p. 294.) In our view, *Roberts* misconstrued that precedent. As we explain, those cases addressed criminal acts that necessarily involved the agreement and participation of two or more actors, and therefore were inherently conspiratorial, yet the Legislature had enacted specific provisions imposing lesser punishment for those acts than punishment under section 182, the general conspiracy statute. The concern in these precedent cases was that applying the general conspiracy statute to those inherently cooperative offenses would lead to greater punishment than the Legislature intended. Assault by a life prisoner, however, is not a crime requiring the cooperation of two or more actors, and therefore the reasoning of the precedent cited in *Roberts* does not apply to that offense. We begin by summarizing that precedent, as well as a case not cited in *Roberts* but on which *Buffum* relied, *People v. Clapp* (1944) 24 Cal.2d 835 (*Clapp*).

### 1. *Precedent cases*

#### a. *Clapp*

In *Clapp*, the defendants were convicted of the then-illegal act of performing an abortion, based in part on the testimony of the patient, Thelma Huntley. (*Supra*, 24 Cal.2d at p. 837.) At issue in the case was whether Huntley was an accomplice to the crime, in which case her testimony would require corroboration from evidence other than the testimony of another accomplice. (*Ibid.*)

Section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial . . . ." The question in *Clapp*, then, was whether Huntley could be prosecuted under the same Penal Code provision as the defendants, "or whether the acts of the witness participating in the transaction constitute a separate and distinct offense." (*Clapp*, *supra*, 24 Cal.2d at p. 838.)

At the time *Clapp* was decided, the Penal Code contained two provisions pertaining to abortions. Former section 274 imposed a penalty of two to five years on "[e]very person who provides, supplies, or administers to any woman, or procures any woman to take any medicine, drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life." Former section 275 imposed a potentially lesser penalty of one to five years on "[e]very woman who solicits of any person any medicine, drug, or substance whatever, and takes the same, or who submits to any operation, or to the use of any means whatever, with intent thereby to procure a miscarriage, unless the same is necessary to preserve her life."

The *Clapp* court stated the following principle: "If a statutory provision so defines a crime that the participation of two or more persons is necessary for its commission, but prescribes punishment for the acts of certain participants only, and another statutory provision prescribes punishment for the acts of participants not subject to the first provision, it is clear that the latter are criminally liable only under the specific provision relating to their participation in the criminal transaction. The specific provision making the acts of

31

participation in the transaction a separate offense supersedes the general provision in section 31 of the Penal Code that such acts subject the participant in the crime of the accused to prosecution for its commission." (*Clapp*, *supra*, 24 Cal.2d at p. 838.) Section 31 defines "principals" in a crime, which includes, inter alia, those who "directly commit the act constituting the offense" as well as those who "aid and abet" or "advise[ ] and encourage" the commission of the offense.

In the case of illegal abortions, a woman who "submitted to an abortion knowingly and cooperated with the person who performed it" was subject to prosecution not under the general prohibition on abortion, former section 274, but under former section 275. (*Clapp*, *supra*, 24 Cal.2d at p. 838.) The court concluded, "Since section 275 of the Penal Code covers all acts committed by Thelma Huntley in connection with the abortion, she was subject to prosecution for an offense distinct from the crime of abortion for which the defendants were on trial and was therefore not an accomplice within the meaning of section 1111 of the Penal Code." (*Clapp*, at p. 839.)

### b. *Buffum*

*Buffum*, like *Clapp*, involved illegal abortions, but the two defendants, a physician and a person who arranged the abortions, were charged not with *performing* abortions but with *conspiring* to do so. (*Buffum*, *supra*, 40 Cal.2d at p. 714.) As in *Clapp*, the question was whether the women upon whom the abortions were performed were accomplices such that the trial court had to instruct on corroboration of testimony under section 1111. (*Buffum*, at p. 720.) The defendants argued although under *Clapp* the women could not be accomplices to an actual violation of former section 274, they could nonetheless be

32

convicted as coconspirators to violate that statute and were therefore accomplices under section 1111. (See *Buffum*, at p. 721.)

The Supreme Court disagreed. The court summarized *Clapp* as holding former sections 274 and 275, "construed together, disclose a legislative intent to subject the woman to punishment under section 275 but not under the distinct offense set forth by section 274 and that the specific provision in section 275 supersedes the general provision in section 31 that all persons who aid and abet in the commission of an offense are principals in any crime so committed." (*Buffum*, *supra*, 40 Cal.2d at p. 721.)

The court noted that the conspiracy statute, section 182, "is closely analogous to section 31," defining principals in a crime. (*Buffum*, *supra*, 40 Cal.2d at p. 722.) "Both provisions operate generally with respect to crimes defined in other statutes, and both designate persons who may be punished because of their connection with activities pertaining to such crimes." (*Ibid.*) The court concluded, "[T]he same reasoning which precludes the application of section 31 for the purpose of prosecuting a woman as a principal under section 274 likewise precludes the use of section 182 in prosecuting her for conspiracy to violate section 274. Since, as held in the *Clapp* case, the Legislature has expressed an intent that a woman who consents and voluntarily submits to an abortion is not punishable under section 274, it clearly did not intend that she should be punished for conspiracy to violate that statute. [¶] Although the language of section 182, standing alone, is sufficiently broad to include any agreement to procure an abortion, the provision, like that in section 31, is general and must yield to the specific provision in section 275.

33

Any other construction would mean that the conspiracy law could be used as a device for defeating the legislative intention of imposing a lesser penalty on a woman who violates section 275 than is prescribed for a person convicted under section 274." (*Buffum*, at p. 722.)

The court acknowledged cases "recogniz[ing] that a defendant may be liable to prosecution for conspiracy to commit a given crime even though he is incapable of committing the crime itself." (*Buffum*, *supra*, 40 Cal.2d at p. 722.) "This rule, however, does not apply where the statutes defining the substantive offense disclose an affirmative legislative policy that the conduct of one of the parties involved shall be unpunished." (*Ibid.*) "Similarly, the rule should not be applied where, as here, the Legislature singles out one of the parties for special treatment by enacting a statute which deals only with the conduct of that person and provides for a lesser punishment than is given to the other party." (*Id.* at pp. 722–723.)

### c. *Williams*

The question in *Williams* was "whether an alleged prostitute can be charged with both prostitution and conspiracy to commit prostitution with the alleged pimp who solicits for her." (*Williams*, *supra*, 30 Cal.App.3d at p. 10.) Applying the reasoning of *Buffum*, the Court of Appeal concluded, "Since the Legislature provided for a lesser penalty for prostitution (a misdemeanor) than for pimping [citation] and pandering [citation], which are both felonies, it would defeat the legislative classification to permit a prostitute to be charged with conspiracy in a case in which the alleged co-conspirator is either a pimp or panderer." (*Williams*, at p. 14.)

34

The court noted case law holding that a prostitute could not be an accomplice to a pimp, and " ' "[t]he woman who permits herself to be criminally exploited is not in the same relation to the crime and does not approach it from the same direction as the exploiter. . . . [Citation.]' [Citation.]" (*Williams*, *supra*, 30 Cal.App.3d at pp. 14–15.) "From these cases a rule emerges, applicable to the limited area in which Congress or the Legislature has dealt with crimes which necessarily involve the joint action of two or more persons, and where no punishment at all, or a lesser penalty, is provided for the conduct, or misconduct, of one of the participants. Thus, the female 'transportee' in a Mann Act situation and the unmarried participant in adulterous intercourse, whose participation is not denounced by statute, cannot be charged with criminal conduct by the improper use of the conspiracy statute. By the same token, abortees and prostitutes for whose criminal participation with aborters or with pimps and panderers the Legislature has prescribed a lesser punishment, may not be subjected to greater punishment by the misuse of the conspiracy statute." (*Id.* at p. 15.) "The use of the conspiracy law in such situation becomes a device for defeating the legislative intent to impose a lesser penalty upon prostitution than upon pimping, or to impose a greater penalty for the substantive offense of prostitution than was established by the Legislature." (*Ibid.*)

### d. *Mayers*

In *Mayers*, the defendant was convicted under a statute prohibiting three-card monte games,[10] section 332, as well as under a provision of the conspiracy statute, section 182, former subdivision (4), prohibiting conspiracy "[t]o cheat and defraud any person of any property." (*Mayers*, *supra*, 110 Cal.App.3d at p. 811.)[11] The question in the appeal was whether "the specific provision . . . proscribing 'three-card monte' must prevail over the general sanction against conspiracy to defraud." (*Mayers*, at p. 812.) The Court of Appeal answered in the affirmative and reversed the conspiracy conviction. (*Id.* at p. 817.)

The court stated the "firmly established principle" that "where specific conduct is prohibited by a special statute, a defendant cannot be prosecuted under a general statute." (*Mayers*, *supra*, 110 Cal.App.3d at p. 813.) The court construed *Williams* as applying this principle to bar conviction for both prostitution and pimping. (*Mayers*, at p. 814.) "The foregoing

---

[10] Three-card monte is a "confidence scheme" that "uses a combination of two black cards and one red, or the reverse. The cards are bent into tent fashion for easy handling, and each card is manipulated with a different finger by the dealer in order to give a false appearance as to where the winning (odd) card has been placed after the shuffle. In addition to the dealer, there are minimally two other participants in the game, a shill associated with the dealer and a mark or chump." (*Mayer, supra*, 110 Cal.App.3d at p. 811.) "A shill's function includes verbally encouraging onlookers to participate, placing enticing bets, as well as distracting the crowd from the dealer's sleight of hand." (*Id.* at pp. 811–812.)

[11] The prohibition on conspiracies to defraud is now enumerated in section 182, subdivision (a)(4).

36

rule is necessary to prevent a general statute from swallowing up the exceptions contained in specific enactments." (*Ibid.*) "By simple logic, if section 182 is applicable under these narrow facts, any section 332 misdemeanor violation would be automatically elevated to a felony by applying the general law of section 182, [former] subdivision (4)." (*Mayers*, at p. 814.)

The court rejected the Attorney General's argument that section 332 and section 182, former subdivision (4) punished different conduct, in that a conviction for conspiracy to defraud under section 182 required "concerted effort of a dealer and shill" and thus "is an offense of greater culpability." (*Mayers*, *supra*, 110 Cal.App.3d at pp. 814–815.) Citing testimony of "the chief prosecution witness," the court stated "three-card monte *requires* the concerted effort of a dealer and shill." (*Id.* at p. 815, italics added.) Thus, "[p]unishment as a conspiracy would void section 332's specifically sanctioned misdemeanor punishment of three-card monte . . . ." (*Mayers*, at p. 815.)

The *Mayers* court further observed, "A separate legal doctrine supports dismissal of the conspiracy charge," and cited "Wharton's Rule." (*Mayers*, *supra*, 110 Cal.App.3d at p. 815.) Wharton's Rule provides, "Where the cooperation of two or more persons is necessary to the commission of the substantive crime, and there is no ingredient of an alleged conspiracy that is not present in the substantive crime, then the persons necessarily involved cannot be charged with conspiracy to commit the substantive offense and also with the substantive crime itself." (*Ibid.*) "The rule is considered in modern legal thinking as an aid in construction of statutes, a presumption that the Legislature intended the general conspiracy section be merged with the more specific substantive offense." (*Ibid.*) *Mayers* concluded,

"Wharton's Rule further substantiates our earlier conclusion that the specific conduct prohibited, made a misdemeanor by a special statute, cannot be prosecuted under a general statute punishing the identical conduct as a felony." (*Ibid.*) "If it is impossible to have three-card monte without concerted effort amounting to conspiracy and conspiracy is punishable as a felony [citation], then the result is section 332's provision for punishment of misdemeanor three-card monte would be stricken from the statute books by a prosecutorial sleight of hand in charging a conspiracy." (*Mayers*, at p. 816.)

### 2. *Analysis*

What unites *Clapp*, *Buffum*, *Williams*, and *Mayers*, and distinguishes them from *Roberts* and the instant case, is that *Clapp*, *Buffum*, *Williams*, and *Mayers* involved offenses that, by their very nature, require the agreement and concerted action of at least two individuals: an illegal abortion requires a doctor and a patient, pimping and pandering requires a pimp/panderer and prostitute, and three-card monte requires a dealer and a shill. As *Clapp* and *Williams* stated expressly, the joint-action aspect of the offenses is a threshold requirement for the application of the exception to accomplice liability and/or the general conspiracy statute. (See *Clapp*, *supra*, 24 Cal.2d at p. 838 [exception applies "[i]f," inter alia, "a statutory provision so defines a crime that the participation of two or more persons is necessary for its commission"]; *Williams*, *supra*, 30 Cal.App.3d at p. 15 [exception is "applicable to the limited area in which Congress or the Legislature has dealt with crimes which necessarily involve the joint action of two or more persons"].)

That the crimes at issue by definition require the participation of two or more people is essential to the reasoning of

38

these precedent cases.  *Clapp*, *Buffum*, and *Williams* involved cooperative criminal acts in which the Legislature had chosen not to impose equal liability on all participants, but instead had parsed out the different participants' conduct and imposed different levels of punishment depending on that conduct.  Thus, the woman who underwent an abortion was subject to less punishment than the doctor who provided the abortion, and the prostitute was subject to less punishment than the pimp.  In this circumstance, in which the Legislature had expressly accounted for the differing aspects of participation in a criminal transaction, *Clapp*, *Buffum*, and *Williams* held it would be contrary to legislative intent to allow accomplice liability or the conspiracy statute to bypass the distinctions drawn by the Legislature and subject all participants equally to the statute with the greater penalty.  (*Buffum*, *supra*, 40 Cal.2d at p. 722 ["Since, as held in the *Clapp* case, the Legislature has expressed an intent that a woman who consents and voluntarily submits to an abortion is not punishable under section 274, it clearly did not intend that she should be punished for conspiracy to violate that statute."]; *Williams*, *supra*, 30 Cal.App.3d at p. 15 ["The use of the conspiracy law in such situation becomes a device for defeating the legislative intent to impose a lesser penalty upon prostitution than upon pimping, or to impose a greater penalty for the substantive offense of prostitution than was established by the Legislature."].)

The joint-action requirement was similarly essential to *Mayers*'s reasoning.  The misdemeanor offense at issue in *Mayers*, running a three-card monte game, necessarily involved the concerted effort of a dealer and a shill, and thus by definition also satisfied the elements of the general conspiracy statute.  (See

39

*Mayers*, *supra*, 110 Cal.App.3d at p. 816 ["it is impossible to have three-card monte without concerted effort amounting to conspiracy"].)  This means that "any [three-card monte] misdemeanor violation would be automatically elevated to a felony by applying the general [conspiracy statute]," which "would void section 332's specifically sanctioned misdemeanor punishment of three-card monte."  (*Mayers*, at pp. 814–815.)

Unlike the offenses at issue in *Clapp*, *Buffum*, and *Williams*, assault by a life prisoner is not a crime requiring the participation of two or more individuals—a single actor may commit the offense.  The crime therefore is not susceptible to the legislative parsing illustrated in these precedent cases, setting forth different levels of culpability depending on each participant's particular role in a single criminal transaction.

True, the Legislature has enacted two prisoner assault statutes covering different categories of perpetrators. Section 4500 penalizes assaults by life prisoners with malice aforethought.  Section 4501 penalizes assaults by life prisoners without malice aforethought or by nonlife prisoners.  Nothing in the language of those statutes suggests, however, they are intended to penalize different aspects of a single criminal transaction.  In the case of inherently cooperative crimes like illegal abortion or pimping, in which the Legislature has set forth different penalties according to the different roles of the participants, it is reasonable to conclude the Legislature did not intend the conspiracy statute to override those distinctions.  The Legislature already has accounted for the conspiratorial nature of the crime and assigned levels of culpability accordingly.  We cannot draw the same conclusion here, where the statutes at issue are not inherently cooperative—sections 4500 and 4501

40

define separate, unrelated crimes, not different roles played in a single criminal transaction.

Nor is there a concern, as in *Mayers*, that a nonlife prisoner subject to conviction under section 4501 will in all events also be convicted under the conspiracy statute for the more severe crime of assault by a life prisoner. That is, application of the conspiracy statute to assault by a life prisoner does not render section 4501 a nullity—the latter remains salient in cases of assault not involving a life prisoner or that otherwise do not meet the elements of section 4500. This is not a case of "a general statute . . . swallowing up the exceptions contained in specific enactments." (*Mayers*, *supra*, 110 Cal.App.3d at p. 814; see *People v. Tatman* (1993) 20 Cal.App.4th 1, 9 [rationale of *Mayers* and *Williams* inapplicable to crimes that can be committed by "one person acting alone," in that case poaching abalone.)

Our conclusion is supported by *People v. Thompson* (1954) 122 Cal.App.2d 567 (*Thompson*). That case involved section 6200 and 6201 of the Government Code, which prohibit theft or destruction of public records. (*Thompson*, at p. 569.) Government Code section 6200 applies to officers, and is punishable as a felony, whereas Government Code section 6201 applies to nonofficers, and may be punished as a felony or a misdemeanor. (*Thompson*, at p. 569.)

The question in *Thompson* was whether the defendant nonofficer could be convicted under Government Code section 6200 as an aider and abettor to an officer who violated that statute. (*Thompson, supra*, 122 Cal.App.2d at p. 569.) The defendant argued he could not, because the enactment of Government Code section 6201 indicated "the intention of the

41

Legislature to make the nonofficer punishable only for commission of the lesser offense." (*Thompson*, at p. 569.)

The Court of Appeal disagreed. The court quoted *Clapp*'s language regarding " 'a statutory provision [that] so defines a crime that the participation of two or more persons is necessary for its commission . . . .' " (*Thompson, supra*, 122 Cal.App.2d at p. 569.) The court noted *Buffum* extended *Clapp* to apply to conspiracies as well as aiding and abetting. (*Thompson*, at p. 570.) The court stated, "The opinions in [*Clapp* and *Buffum*] should be read in the light of the facts outlined in the foregoing quotation." (*Thompson*, at p. 570.) "Unless we are mistaken the reasoning of the court would not apply to an offense which did not require the participation of two or more persons." (*Ibid.*)

The court continued, "The offense defined in [Government Code] section 6200 is not one in which two or more persons necessarily participate. [Government Code section] 6201 does not relate to participation by a nonofficer with an officer in a violation of section 6200. Since a violation of section 6200 could be committed by one person alone there was no occasion to prescribe punishment for a nonofficer who might be a participant. Hence there is no significance in the omission from the section of a prescribed punishment for one not an officer who might participate in the act." (*Thompson, supra*, 122 Cal.App.2d at p. 570.) "Inasmuch as the *Clapp* and *Buffum* cases are not in point we think there is no authority for the proposition that one who aids and abets another in the commission of a crime may not be prosecuted as a principal if, perchance, he would have been subject to prosecution for a lesser offense if he, alone, had committed the forbidden act." (*Thompson*, at pp. 570–571.)

The court further "c[ould not] discover in the scheme of [Government Code] sections 6200 and 6201 an implied intention of the Legislature to excuse a nonofficer who aids and abets an officer in a violation of [Government Code] section 6200 from any of the consequences which would fall upon the latter. The officer's crime involves a breach of trust and for that reason is made a more serious offense than a like act of a nonofficer. When the latter aids and abets in a violation of [Government Code] section 6200, in the eyes of the law he places himself in the category of an officer and becomes a principal in the greater crime by virtue of [Penal Code] section 31." (*Thompson, supra,* 122 Cal.App.2d at p. 571.)[12]

*Thompson* is consistent with our conclusions that 1) the exception articulated in *Clapp* and *Buffum* applies only to crimes necessarily requiring more than one participant and 2) the fact the Legislature has imposed different penalties for the same type of conduct depending on the classification of the offender does not indicate an intent to spare the offender subject to the lesser penalty from the more severe penalty under principles of aiding and abetting or conspiracy. Just as a nonofficer, who would not be subject to Government Code section 6200 if he stole or destroyed public records on his own, can nonetheless be convicted as an aider and abettor to an officer, a nonlife prisoner otherwise not subject to Penal Code section 4500 can be convicted when he conspires with a life prisoner.

*Roberts*, which did not cite or discuss *Thompson*, concluded to the contrary, noting "Section 4501 of the Penal Code deals with

_____

[12] A dissenting justice stated he would reverse the judgment against the nonofficer, but provided no reasoning. (*Thompson, supra,* 122 Cal.App.2d at p. 572.)

43

a person in respondent's classification, i.e., a state prisoner serving less than a life sentence, but dealing with the same type of prohibited conduct specified in section 4500 of the Penal Code." (*Roberts*, *supra*, 139 Cal.App.3d at p. 293.) From this, *Roberts* discerned a legislative intent to impose a lesser penalty on nonlife prisoners who participate in assaults. (*Id*. at pp. 293–294.) In other words, because section 4501 encompassed the defendant's participation in the crime, *Roberts* held it would thwart the Legislature's intent to subject him to a more severe penalty under section 4500 via the conspiracy statute.

Extending *Roberts*'s reasoning to its logical conclusion, we would have a rule that the Legislature, by excluding a category of individuals from the definition of an offense, thereby intended those individuals never be punished for that offense and instead be subject to a different criminal statute or none at all. That, however, is not the rule. The general rule is a defendant may be convicted of conspiracy to commit a crime even if the defendant could not commit the crime itself. (See *Buffum*, *supra*, 40 Cal.2d at p. 722.) The exceptions to that rule, as discussed, are circumstances in which the Legislature, in defining a criminal act, already has accounted for its conspiratorial nature, in which case the specific pronouncement overrides the general conspiracy law. Assault by a life prisoner, a crime that can be committed by a single individual, does not present that circumstance, and thus does not compel the conclusion reached in *Clapp*, *Buffum*, *Williams*, and *Mayers*. Indeed, *Roberts* is the *only* case we have found applying the exception from *Buffum*, et al., to an offense not requiring joint action.

We acknowledge that *Buffum*, unlike *Clapp* and *Williams*, did not articulate a rule expressly limiting its exception to crimes

44

involving joint action.  *Buffum* held the general rule that parties may be convicted of conspiracy to commit crimes the parties could not themselves commit "does not apply where the statutes defining the substantive offense disclose an affirmative legislative policy that the conduct of one of the parties involved shall be unpunished." (*Buffum*, *supra*, 40 Cal.2d at p. 722.) "Similarly, the rule should not be applied where . . . the Legislature singles out one of the parties for special treatment by enacting a statute which deals only with the conduct of that person and provides for a lesser punishment than is given to the other party." (*Id.* at pp. 722–723.)  *Roberts* quoted this language, and then concluded the fact the Legislature had prescribed different penalties for assaults by life and nonlife prisoners demonstrated a legislative intent to impose lesser penalties on nonlife prisoners.  (*Roberts*, *supra*, 139 Cal.App.3d at pp. 293–294.)

We agree with *Thompson* that *Buffum* must be read to apply solely to necessarily cooperative crimes, despite the absence of express language to that effect.  (See *Thompson*, *supra*, 122 Cal.App.2d at p. 570.)  As discussed, *Buffum* relied primarily on *Clapp*, which expressly stated its ruling applied when "a statutory provision so defines a crime that the *participation of two or more persons is necessary for its commission.*" (*Clapp*, *supra*, 24 Cal.2d at p. 838, italics added.) Also, *Buffum*'s references to "one of the parties" strongly suggests the offenses to which *Buffum* intended to apply its holding must involve more than one party, which is consistent with *Clapp*, *Williams*, and *Mayers*.  *Buffum* itself involved an inherently cooperative offense, illegal abortion, thus further bolstering our

45

reading.  We therefore do not interpret *Buffum* as intending to extend the *Clapp* rule to offenses not requiring joint action.

We also disagree with *Roberts*'s holding as a policy matter. Section 4500 was enacted "to deter severely violent crime by those who might otherwise think themselves immune from punishment because they were already" serving life sentences. (*In re Carmichael* (1982) 132 Cal.App.3d 542, 546.)  This purpose is ill served if nonlife prisoners are not similarly disincentivized from conspiring with, encouraging, or otherwise aiding life prisoners in carrying out assaults.  A nonlife prisoner who wishes to effect an assault might specifically look to a life prisoner for aid on the theory the life prisoner has nothing to lose and will be a willing participant.  Imposing conspiracy liability on the nonlife prisoner for the more serious crime of assault by a life prisoner discourages this course of action.

A similar conclusion was reached in *Lee*, which, to recap, held that an inmate could be convicted of conspiracy to violate a statute prohibiting a noninmate from providing illegal drugs to inmates.  (*Lee, supra*, 136 Cal.App.4th at pp. 522, 528.)  "To hold otherwise," the *Lee* court reasoned, "would lead to the absurd result of an incarcerated drug kingpin, using noninmate 'mules' to smuggle into prison contraband that is then sold to other inmates in a profit-making business enterprise, and yet escaping the increased penalties to which the 'mules,' who operate at his or her direction, are subject." (*Id.* at p. 538.)  Applying that same logic to the instant case, it cannot be that the Legislature intended a lesser penalty for a nonlife prisoner that, like defendant, conspires to have a life prisoner commit an assault.

*Lee* catalogued *Roberts* along with *Buffum*, *Williams*, *Mayers*, and other authorities as examples of cases finding

particular offenses exempt from the general conspiracy statute. (*Lee*, *supra*, 136 Cal.App.4th at pp. 532–535.)  *Lee* concluded *Roberts* and the other cases were distinguishable because "[i]n each, the overriding consideration is the Legislature's intent . . . that one party escape punishment, or be punished less severely," yet "[w]e discern no such intent here."  (*Lee*, at p. 536.)  Because *Lee* found *Roberts* distinguishable, it had no occasion to consider the question before us, namely whether *Roberts* was correctly decided in the first place.  We do not read *Lee*'s discussion of *Roberts* as an endorsement of its holding.

Indeed, *Lee*'s articulation of the exemption illustrated by *Buffum*, et al., supports our conclusion the exemption applies solely to inherently cooperative crimes:  "[W]here the Legislature has dealt with crimes *which necessarily involve the joint action of two or more persons* and where no punishment is provided for the conduct of one of the parties, that person cannot be charged as a principal, coconspirator, or aider and abettor if (1) a different and more lenient criminal statute is found to be controlling as to such person, or (2) there is an affirmative legislative intent that such participant go unpunished."  (*Lee*, *supra*, 136 Cal.App.4th at p. 531, italics added.)

We therefore decline to follow *Roberts*, and hold defendant could be convicted of gang conspiracy to commit assault by a life prisoner.

## H. The Trial Court Did Not Err In Instructing the Jury of the Natural and Probable Consequences Doctrine

Defendant argues it was improper to instruct the jury that he could be convicted of conspiracy to commit assault by a life prisoner under the natural and probable consequences doctrine, and cites *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*) in support

47

of his contention. *Chiu* held that an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine. (*Id.* at pp. 158–159.) As we discuss below, *Chiu*'s rationale is inapplicable to the instant case.

### 1. *Additional background*

As noted in the Factual Background, *ante,* the two inmates who attacked Listo were not the inmates defendant and the other conspirators planned would carry out the attack. Rather, the attackers were substitutes Gauge enlisted on the day of the attack. Although there was evidence the actual attackers were life prisoners, there was no evidence the inmates defendant intended to carry out the attack were themselves life prisoners. Thus, there was no evidence defendant, in conspiring to attack Listo, intended an assault by life prisoners.

The prosecution nonetheless argued defendant was culpable for the acts of the actual attackers under the natural and probable consequences doctrine, which provides, " ' "A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime." ' [Citation.]" (*Chiu, supra,* 59 Cal.4th at p. 161.) The prosecution argued that when the Mexican Mafia arranges an attack by inmates, it is not only probable but common the attack will be carried out by life prisoners, who have less to lose and more to gain from committing additional crimes in prison.

Accordingly, the trial court instructed the jury, "In order to commit the crime of assault by a life prisoner, the People must prove that: [¶] One, the defendant is guilty of assault by a prisoner; [¶] [t]wo, during the commission of assault by a

48

prisoner, a co-participant in that assault by a prisoner committed the crime of assault by a life prisoner; [¶] [and three], under all the circumstances, a reasonable person in the defendant's position would have known that the commission of the assault by a life prisoner was a natural and probable consequence of the commission of the assault by a prisoner." The court also instructed on the elements of assault by a life prisoner and assault by a prisoner. On appeal, defendant takes no issue with these instructions, apart from his challenge under *Chiu*.

### 2. Chiu

In *Chiu*, a jury found the defendant guilty of first degree willful, deliberate and premeditated murder "on the theory that either he directly aided and abetted the murder or he aided and abetted the 'target offense' of assault or of disturbing the peace, the natural and probable consequence of which was murder." (*Chiu, supra,* 59 Cal.4th at p. 158.) The question presented was whether the natural and probable consequences doctrine was a valid basis to support such a conviction. (See *id.* at pp. 158–159.)

Our Supreme Court stated, "In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing." (*Chiu, supra,* 59 Cal.4th at p. 165.) "However, this same public policy concern loses its force in the context of a defendant's liability as an aider and abettor of a first degree premeditated murder." (*Id.* at p. 166.)

The court explained, "First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of

49

willfulness, premeditation, and deliberation, which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death." (*Chiu*, *supra*, 59 Cal.4th at p. 166.) Also, "whether a direct perpetrator commits a nontarget offense of murder with or without premeditation and deliberation has no effect on the resultant harm. The victim has been killed regardless of the perpetrator's premeditative mental state." (*Ibid.*)

The court concluded, "Although we have stated that an aider and abettor's 'punishment need not be finely calibrated to the criminal's mens rea' [citation], the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the above stated public policy concern of deterrence. [¶] Accordingly, we hold that punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine. We further hold that where the direct perpetrator is guilty of first degree premeditated murder, the legitimate public policy considerations of deterrence and culpability would not be served by allowing a defendant to be convicted of that greater offense under the natural and probable consequences doctrine." (*Chiu*, *supra*, 59 Cal.4th at p. 166.)

### 3. *Analysis*

Defendant in his briefing reiterates *Chiu*'s holding that "a defendant may not be convicted of first degree murder under the natural and probable consequences doctrine," then argues "[t]he rationale of *Chiu* applies here and it should not be lawful to impose aider and abettor liability under the natural and probable consequences doctrine for assault by a state prisoner (§ 4501[, subd.] (b)) or assault by a life prisoner (§ 4500)." Defendant notes assault by a life prisoner under section 4500 "requires malice aforethought," which defendant argues "is a uniquely subjective and personal mental state that an aider and abettor of a lesser offense does not necessarily share with the direct perpetrator." He further argues, "[T]he punishment for assault crimes is not commensurate with an aider and abettor's liability, since the punishment for assault by a state prisoner by means of force likely to produce great bodily injury is imprisonment in state prison for two, four, or six years, to be served consecutively (§ 4501[, subd.] (b)), and the punishment for assault by a life prisoner by means of force likely to produce great bodily injury where the victim does not die within a year and one day is nine years to life (§ 4500). The disparity in these punishments suggests that . . . a conviction of assault by life prisoner should not be premised on the natural and probable consequences doctrine."

Apart from stating *Chiu*'s ultimate holding, defendant does not summarize or discuss the case to explain how it is analogous to the instant matter, and therefore provides no cogent analysis to aid in our assessment of his challenge. (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287 [appellate court "may disregard conclusory arguments that . . . fail to disclose the

51

reasoning by which the appellant reached the conclusions he wants us to adopt"].)

As best we can discern defendant's arguments, he misreads *Chiu*. The "uniquely subjective and personal" mental state in *Chiu* was not "malice aforethought," but the additional elements of willfulness, premeditation, and deliberation required for first degree murder. (*Chiu, supra*, 59 Cal.4th at p. 166.) *Chiu* in fact *approved* use of the natural and probable consequences doctrine to convict aiders and abettors of second degree murder, a crime requiring malice aforethought. (*Ibid.* ["punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine"].) *Chiu* therefore does not disapprove using the natural and probable consequences doctrine to establish liability for crimes requiring malice, such as assault by a life prisoner.

We recognize that amendments to the Penal Code in recent years have eliminated the natural and probable consequences doctrine as applied to all murders, whatever their degree, as well as attempted murder, by providing "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3); *People v. Lee* (2023) 95 Cal.App.5th 1164, 1173–1174.) Defendant does not argue these amendments apply to assaults by life prisoners, and we therefore express no opinion on that question.

Regardless, in the instant case the jury expressly found defendant personally acted with malice. The verdict form for gang conspiracy to commit assault by a life prisoner expressly asked for a finding as to whether defendant acted with malice,

52

and the jury answered in the affirmative. Further, the court instructed the jury that to find defendant guilty for gang conspiracy to commit murder and attempted murder, the jury must find defendant acted with intent to kill, that is, express malice. (See § 188, subd. (a)(1).) The jury convicted defendant of those charges, thus necessarily finding he acted with express malice. The conspiracy to commit murder and the attempted murder charges arose from the same conduct underlying the assault by a life prisoner. It is therefore not possible the jury found defendant harbored malice as to the conspiracy to commit murder and attempted murder, but not the assault by a life prisoner, all of which arose from the attack on Listo.

To the extent defendant is arguing *Chiu* is applicable because assault by a life prisoner is punished more severely than assault under other statutes, we disagree. *Chiu* did not assert the severe penalties for first degree murder were an independent basis to prohibit liability under the natural and probable consequences doctrine. Rather, *Chiu* emphasized the "attenuated" "connection between the defendant's culpability and the perpetrator's premeditative state," and noted that attenuated connection did not justify "impos[ing] aider and abettor liability for first degree murder under the natural and probable consequences doctrine, *especially* in light of the severe penalty involved and the above stated public policy concern of deterrence." (*Chiu*, *supra*, 59 Cal.4th at p. 166, italics added.) The severe penalties at issue bolstered *Chiu*'s conclusion, but did not independently support it.

In sum, defendant does not demonstrate reversible error in the trial court's instructing the jury on the natural and probable consequences doctrine.

**I.      Defendant Was Not Convicted of Multiple Gang Conspiracies, But a Single Conspiracy Charged Three Ways**

Defendant construes the verdict as convicting him of three conspiracies.  He argues this was improper because the evidence demonstrated only one conspiracy, the conspiracy to attack Listo.  He contends the trial court should have instructed the jury to determine whether defendant had participated in multiple conspiracies or just one.

We reject the premise underlying defendant's argument.  Defendant was not indicted for engaging in multiple gang conspiracies or committing multiple separate crimes.  Rather, the indictment charged him in three different ways for the same underlying conduct.  This is why two of his three convictions must be stayed under section 654.  To the extent defendant suggests it was improper to charge him in different ways for the same underlying conduct, he cites no authority to support that contention and thus forfeits it.  (*People v. Dougherty* (1982) 138 Cal.App.3d 278, 282–283.)

## DISPOSITION

The convictions are affirmed. The sentence is vacated. On remand, the trial court shall resentence defendant, staying execution of sentence on two of the three counts pursuant to Penal Code section 654.

CERTIFIED FOR PUBLICATION.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.